# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SEAN GUILDAY,**<br>　　　　　**Plaintiff,**<br><br>　　　**v.**<br><br>**CRISIS CENTER AT CROZER-**<br>**CHESTER MEDICAL CENTER et al.,**<br>　　　　**Defendants.** | **CIVIL ACTION**<br><br><br>**NO.  21-2010** |

## MEMORANDUM OPINION

*Pro se* Plaintiff Sean Guilday was involuntarily committed at the Crozer-Chester Medical Center ("Crozer-Chester") for emergency psychiatric treatment upon the petition of his father, a physician.  Plaintiff's committal lasted seven to eight days, during which time he refused all medical care and suffered considerable distress.  After his release, Plaintiff filed suit against various entities affiliated with Crozer-Chester (collectively, the "Crozer-Chester Defendants"),[1] with Delaware County (the "County Defendants"),[2] and with the Commonwealth of Pennsylvania, alleging that the committal and related events had violated his constitutional, statutory, and state law rights.  This opinion addresses the Crozer-Chester Defendants' Motion to

---

[1] Prospect Medical Holdings, Inc.; Prospect CCMC, LLC; Crisis Center at Crozer-Chester Medical Center; Prospect CCMC, LLC d/b/a Crisis Center at Crozer-Chester Medical Center; Crozer Health Inpatient Psychiatry in North Campus at Crozer-Chester Medical Center; Prospect CCMC LLC d/b/a Crozer Health Inpatient Psychiatry in North Campus at Crozer-Chester Medical Center; Akiba Bailey; Darren Piechota, M.D.; Amy Bebawi, M.D.; John/Jane Doe (The Director of Facility, Crozer Health Inpatient Psychiatry in North Campus at Crozer-Chester Medical Center); and John/Jane Doe (Director of Facility, Crozer Crisis Center at Crozer-Chester Medical Center).

[2] Collectively, the County of Delaware; the Delaware County Office of Behavioral Health; the Delaware County Office of Behavioral Health, Division of Mental Health, Adult; Tracy Halliday; and Dion Gilliard.  The Complaint alleges that the Delaware County Office of Behavioral Health is a subdivision of the Delaware County Department of Human Services, and that the Division of Mental Health, Adult, is a "comprising office" of the Office of Behavioral Health.  It asserts that Halliday is the County Administrator responsible for granting warrants pursuant to 50 Pa. C.S.A. § 7302, and that Gilliard is the Mental Health Court Clerk for the Office of Behavioral Health.

Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), and the County Defendants' Motion to Dismiss pursuant to the same rule.  For the reasons that follow, Plaintiff's federal law claims against the Crozer-Chester Defendants will be dismissed with prejudice and his federal law claims against the County Defendants will be dismissed in part with prejudice and in part without prejudice.  His state law claims against all Defendants will be dismissed without prejudice.

## I.    FACTUAL ALLEGATIONS

The facts below are taken from Plaintiff's Complaint as is proper on a motion to dismiss. Plaintiff's ordeal began on June 2, 2020, when the police transported him, in handcuffs, from his home to a Crozer-Chester facility.  The police acted on authority of a warrant for emergency examination issued by Delaware County upon the application of Plaintiff's father.  The warrant procedures stem from the Pennsylvania Mental Health Procedures Act ("MHPA"), a statute that permits the involuntary emergency examination and treatment of an individual who "poses a clear and present danger of harm to others or to himself," due to mental illness.  50 Pa. C.S.A. § 7301(a).

Upon arrival at Crozer-Chester, testing revealed that Plaintiff had an elevated temperature, and police took him to the Emergency Department for COVID-19 testing.  They removed his handcuffs only once he was placed in a treatment room.  In front of female medical personnel, Plaintiff was instructed to strip, put on a hospital gown, and submit to testing. Plaintiff felt that he was not free to leave.

Over four hours later, Plaintiff was returned to Crozer-Chester, still in a hospital gown. He had not been told why he was there or given anything to eat.  Staff gave Plaintiff a pair of scrub pants but no socks or shoes, and left him in a waiting room for at least two hours.  More

patients arrived, some of whom arrived after Plaintiff but were taken to see a physician before him.  Some of the other patients in the waiting room were shouting loudly and incoherently.

Eventually, Plaintiff was examined by Doctor Darren Piechota, a psychiatrist at Crozer-Chester.  On his way to the interview room, he noticed that the doors had security features and felt that he was not free to leave.  Plaintiff felt intimidated during this examination because Doctor Piechota expressed skepticism about his story, and said that he knew that Plaintiff's father worked as a physician at the adjacent hospital and had applied for the warrant.  After the examination, Plaintiff returned to the waiting room and picked up the TV remote control.  Seeing this, another patient yelled at Plaintiff and wrested the remote from him.  The patient and another individual began to menace and taunt Plaintiff.  He spent the night in the waiting room.

The next day, June 3, Plaintiff was transferred to Crozer-Chester's North Campus.  He was given a pair of socks but had to walk outside without shoes.  He had not eaten or slept since his arrival.  At the North Campus, Plaintiff was examined by another psychiatrist, Doctor Amy Bebawi.  Someone later told him that Doctor Bebawi was filing a petition for extended involuntary treatment of up to 20 days.[3]  He was further told that he could have an attorney to challenge the petition at a hearing.

The hearing was held on June 5, but Plaintiff alleged that he was not able to consult with his lawyer before or during the proceeding.  Plaintiff requested a copy of the certification for extended involuntary commitment that evening, but was told that Crozer-Chester had not

---

[3] Although the initial period of involuntary emergency treatment under the MHPA may not exceed 120 hours, 50 Pa. C.S.A. § 7302(d), the Act permits a treatment facility to apply to the Pennsylvania Court of Common Pleas for extended treatment if it determines that the person's need for emergency treatment is likely to extend beyond that period.  *Id.* § 7303(a).  A judge or mental health review officer then conducts an informal hearing to determine whether the person needs continued treatment.  *Id.* § 7303(b).  If so, the judge or review officer will make a written certification for extended involuntary treatment, *id.* § 7303(c)-(d), a copy of which must be served on the committed individual.  *Id.* § 7303(e).

3

received it.  On June 7, he was informed by a physician's assistant that his committal had been extended for up to 20 days, and he was read a text message confirming that a certification for extended involuntary treatment had been issued.  He reiterated his request for a copy of the document every day until his discharge, to no avail.  Although he received a copy of his medical records from Crozer-Chester on June 22, the certification was not among them.

On June 8, Doctor Bebawi told Plaintiff that she had spoken with his father.  The three of them later talked on a conference call during which Plaintiff's father said that he could come home.  Plaintiff was released shortly thereafter.  Later that month, Plaintiff hired an attorney and challenged his involuntary commitment in the Pennsylvania Court of Common Pleas.  At a hearing on September 17, 2020, the Delaware County Office of Behavioral Health produced a copy of the certification for extended involuntary treatment.  Although the document was admitted into evidence, Plaintiff maintains that he still did not personally receive a copy.  On October 29, 2020, the Court of Common Pleas "ordered the commitment expunged and the record vacated."

Throughout his commitment, Plaintiff experienced constant dread and anxiety, could not eat or sleep, and was in physical pain.  To this day, he continues to suffer psychological and physical symptoms arising out of these events.  For the provision of emergency treatment services, he received a bill totaling over $35,000.

## II.     STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Id*.  In conducting this analysis, legal conclusions are disregarded and well-pleaded facts are taken as true.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  In particular, a *pro se* complaint is liberally construed.  *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021).

## III.    FEDERAL CLAIMS AGAINST THE CROZER-CHESTER DEFENDANTS

### A. Constitutional Claims

The Complaint challenges the manner in which the Crozer-Chester Defendants conducted Plaintiff's emergency examination and the adequacy of the care that they provided during his subsequent commitment.  The Crozer-Chester Defendants argue that Plaintiff's federal constitutional claims must be dismissed because they are not state actors within the meaning of Section 1983.

#### i.    *Legal Standards*

"Title 42 U.S.C. § 1983 provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when that deprivation takes place 'under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory.'"  *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982).[4]  To state a Section 1983 claim, a plaintiff must allege:

(1) "the violation of a right secured by the Constitution and laws of the United States," (2) "committed by a person," (3) "acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).  The third element evokes a "state action" requirement which limits liability under

---

[4] "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment."  *Rendell–Baker v. Kohn*, 457 U.S. 830, 838 (1982) (quoting *United States v. Price*, 383 U.S. 787, 794 n.7 (1966)); *see also Lugar*, 457 U.S. at 935 ("If the challenged conduct . . . constitutes state action . . . , then that conduct was also action under color of state law and will support a suit under § 1983.").

Section 1983 to conduct that "is fairly attributable to the State."  *Lugar*, 457 U.S. at 937.

"What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity."  *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001).  "[T]he principal question at stake is whether there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."  *Kach v. Hose*, 589 F.3d 626, 646 (3d Cir. 2009) (quoting *Leshko v. Servis*, 423 F.3d 337, 339 (3d Cir. 2005)).  The Supreme Court explained in *Brentwood*:

> Our cases have identified a host of facts that can bear on the fairness of such an attribution. We have, for example, held that a challenged activity may be state action when it results from the State's exercise of "coercive power," when the State provides "significant encouragement, either overt or covert," or when a private actor operates as a "willful participant in joint activity with the State or its agents." We have treated a nominally private entity as a state actor when it is controlled by an "agency of the State," when it has been delegated a public function by the State, when it is "entwined with governmental policies," or when government is "entwined in [its] management or control."

*Brentwood*, 531 U.S. at 296 (internal citations omitted).  "Regardless of whether these are 'tests' or 'facts,' *Brentwood* directs courts to focus on the fact-intensive nature of the state action inquiry, mindful of its central purpose: to assure that constitutional standards are invoked when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains."  *Crissman v. Dover Downs Ent. Inc.*, 289 F.3d 231, 239 (3d Cir. 2002) (emphasis in original) (internal quotation marks omitted) (quoting *Brentwood*, 531 U.S. at 295).

### *ii.   Discussion*

Plaintiff advances a host of theories according to which he alleges the Crozer-Chester Defendants' actions may be "fairly attributable to the State."  Each is addressed in turn below.

Plaintiff first contends that his involuntary commitment resulted from an exercise of the

Commonwealth's coercive power because the warrant for emergency examination was issued pursuant to the MHPA, and the MHPA rests on the Commonwealth's police power.

The express language of the MHPA defeats this contention because it leaves the decision whether to examine or treat individuals involuntarily to the discretion of the examining physicians. *See* 50 Pa. C.S.A. § 7302(a) (an emergency examination "may be undertaken" upon fulfilment of certain prerequisites); *id.* § 7302(b) (examination and treatment are to be conducted only if the examining physician determines that "the person is severely mentally disabled"); *see also Janicsko v. Pellman*, 774 F. Supp. 331, 339 (M.D. Pa. 1991), *aff'd without published opinion*, 970 F.2d 899 (3d Cir. 1992) ("Given the language of the relevant sections of the MHPA, this court cannot say that the involuntary commitment of the mentally ill by private physicians and hospitals is, under the MHPA, a function compelled by or sufficiently connected to state directives to attribute those actions to the state."); *Carver v. Plyer*, 115 F. App'x 532, 537-38 (3d Cir. 2004) (holding that hospital did not conspire with police to involuntarily commit plaintiff, because police did not participate in the decision to treat her).  Therefore, the issuance of an emergency examination warrant pursuant to the MHPA does not coerce private facilities into conducting involuntary examinations or treatment.

Next, Plaintiff argues that the Crozer-Chester Defendants are entwined with the Commonwealth because the County Administrator approves treatment facilities pursuant to 50 Pa. C.S.A. § 7105, and the Commonwealth "controls the standards used for involuntary commitment examinations and related procedures" through the MHPA.

This argument falls short because the "mere fact that a business is subject to state regulations does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) (quoting *Jackson v.*

*Metro. Edison Co.*, 419 U.S. 345, 350 (1974)).  "A complaining party must also show that 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'"  *Id.* (quoting *Jackson*, 419 U.S. at 351).  "The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains."  *Id.* (emphasis in original).  Applying these principles, the Supreme Court held in *Blum* that nursing homes licensed and regulated by the State did not take state action when deciding whether to discharge or transfer certain patients.  *Id.* at 1006-11; *see also Crissman*, 289 F.3d at 246-47 (racetrack licensed and regulated by the State did not take state action when it excluded plaintiffs from the property).

The County's approval of the Crozer-Chester Defendants' facility does not establish a "close nexus" between the Commonwealth and the *specific conduct* that led to Plaintiff's examination and committal.  Nor does the fact that the Pennsylvania legislature mandated the adoption of certain procedures and standards in the operation of the Crozer-Chester Defendants' business entwine them together.  To hold otherwise would expose parties to "constitutional litigation whenever they seek to rely on some state rule governing their interactions with the community surrounding them."  *Lugar*, 457 U.S. at 937.[5]

---

[5] Plaintiff also argues in his brief that the Commonwealth encouraged, or entwined itself with, the Crozer Defendants because the Commonwealth and County receive federal funding for the provision of mental health services, and refer all emergency examinations to Crozer-Chester, purportedly the only crisis center in Delaware County, by issuing warrants.

As a preliminary matter, these statements cannot be taken as true for the purposes of this motion to dismiss because they were not contained in the Complaint.  *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014) ("To decide a motion to dismiss, courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record." (quoting *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993))); *Pennsylvania ex. rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."

Plaintiff also contends that the emergency examination itself constituted the exercise of a traditionally public function.  This theory rests on the idea that the examination was a "search" conducted on behalf of the County and/or the Commonwealth.  The question here is "whether the challenged action relates to a function that has been 'traditionally the *exclusive* prerogative of the State.'"  *Benn v. Univ. Health Sys., Inc.*, 371 F.3d 165, 172 (3d Cir. 2004) (emphasis added) (quoting *Jackson*, 419 U.S. at 353).  "While many functions have been traditionally performed by government, very few have been 'exclusively reserved to the State.'"  *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978) (holding that "the settlement of disputes between debtors and creditors is not traditionally an exclusive public function").  Certainly, the Third Circuit has held that *petitioning* for involuntary confinement has never been "the exclusive prerogative of the State" in Pennsylvania or the United States, *Benn*, 371 F.3d at 172, and this rationale extends to involuntary confinement as well.  Indeed, the private commitment of individuals suffering from

---

(alteration in original) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984), *cert. denied*, 470 U.S. 1054 (1984))).

Even assuming *arguendo* that these statements are true, the mere referral of patients to Crozer-Chester is not an illustration of the prerequisite "close nexus".  At most, Plaintiff's allegations suggest that state referrals indirectly provide some funding to Crozer-Chester, but even facilities *substantially* and *directly* funded by the Commonwealth are not therefor government actors.  *See Rendell-Baker*, 457 U.S. at 840 (private school that derived 90-99% of its income from public sources did not engage in state action); *Blum*, 457 U.S. at 1010-11 (although the State subsidized nursing homes' costs and paid the medical expenses of over 90% of their patients, it was not responsible for their actions).  Similarly, the fact that Crozer-Chester is the only crisis facility in the County does not mean their actions are fairly attributable to the County.  Not even the actions of private entities "total[ly] engage[d] in performing public contracts" are necessarily attributable to the State, and Plaintiff's allegations fall far short of that threshold.  *Rendell-Baker*, 457 U.S. at 841.

Plaintiff's reliance on *Jensen v. Lane Cnty.*, 222 F.3d 570 (9th Cir. 2000) is to no avail because *Jensen* is distinguishable (and, in any case, is not binding on the district courts of the Third Circuit).  The *Jensen* Court held that a private physician had taken state action by ordering the committal of the plaintiff, a pretrial detainee, at a County facility administered and staffed by a private hospital.  *Id.* at 573, 575.  This holding was based on the Court's finding that County employees initiated the evaluation process, that public and private mental health professionals consulted with each other throughout the committal, and that a private psychiatric group helped to "develop and maintain the mental health policies" of the County facility.  *Id.* at 575.  Those facts bear no resemblance to this case, where the petition, examination, and treatment were carried out by private health professionals at a private institution without any consultation with the Commonwealth or County.

9

mental illness dates to at least the Eighteenth Century. *See Spencer v. Lee*, 864 F.2d 1376, 1380-81 (7th Cir. 1989) (concluding that "involuntary extrajudicial commitment to private institutions has long been commonplace" in England and the United States); *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 259-60 (1st Cir. 1994) (concluding that, in Massachusetts, "treatment of the mentally ill was almost exclusively private" during the Colonial era).

For the reasons stated above, Plaintiff cannot sue the Crozer-Chester Defendants for constitutional violations under Section 1983 because their actions cannot be "fairly attributed" to the Commonwealth.  As amendment would be futile, Plaintiff's federal constitutional claims against the Crozer-Chester Defendants will be dismissed with prejudice. *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 114 (3d Cir. 2002).

### B.  HIPAA Claim

Plaintiff also brings a claim under Section 1983 specifically against Crozer-Chester Defendant Doctor Amy Bebawi premised on a violation of the Health Insurance Portability and Accountability Act ("HIPAA") in connection with her communications with his father while he was committed.

A plaintiff may use Section 1983 to enforce federal statutory rights as well as constitutional rights. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 279 (2002) (citing *Maine v. Thiboutot*, 448 U.S. 1 (1980)).  Because only an "unambiguously conferred right" can support a Section 1983 cause of action, it must be determined "whether Congress *intended to create a federal right*" through HIPAA. *Id*. at 283 (emphasis in original).  This question must be "definitively answered in the negative" if the "statute by its terms grants no private rights to any identifiable class." *Id*. at 283-84 (quoting *Touche Ross & Co. v. Redington*, 442 U.S. 560, 576 (1979)).  "For a statute to create such private rights, its text must be 'phrased in terms of the

persons benefited.'" *Id*. (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692, n.13 (1979)).

The Fifth Circuit's reasoning in *Acara v. Banks*, 470 F.3d 569 (5th Cir. 2006) is persuasive here.  In *Acara*, the court explained that instead of bestowing privacy rights on a specific class of individuals, HIPAA focuses on regulating those who access individually identifiable medical information. *Id.* at 571.  Furthermore, the statute delegates enforcement of its provisions to the Secretary of Health and Human Services. *Id.*  Accordingly, the Fifth Circuit concluded that "Congress did not intend for private enforcement of HIPAA." *Id.*  The Third Circuit has agreed with this conclusion (albeit in in two unpublished cases), as have other Circuit Courts to have considered the question. *See Johnson v. WPIC*, 782 F. App'x 169, 170-71 (3d Cir. 2019) (per curiam) (citing *Acara*, 470 F.3d at 571-72); *Hatfield v. Berube*, 714 F. App'x 99, 105-06 (3d Cir. 2017) (quoting *Wilkerson v. Shineski*, 606 F.3d 1256, 1267 n.4 (10th Cir. 2010)); *Payne v. Taslimi*, 998 F.3d 648, 660 (4th Cir. 2021) (collecting cases).  As amendment would be futile, Plaintiff's HIPAA claim will be dismissed with prejudice. *Grayson*, 293 F.3d at 114.

## IV.     FEDERAL CLAIMS AGAINST THE COUNTY DEFENDANTS

Plaintiff alleges that the County Defendants violated his rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.  He specifically evokes the right: (1) "to be free from unreasonable search and seizures"; (2) "to not be deprived of life, liberty, or property, without due process of law"; (3) "to be informed of the nature and cause of the accusation"; (4) "to not have cruel and unusual punishments inflicted"; and, (5) "to not have any State deprive any person of life, liberty, or property without due process of law." Plaintiff does not draw the connection between these alleged constitutional violations and the specific events at issue with precision, but each claim will be evaluated in turn below, adopting a liberal reading of the Complaint such that his claims are construed broadly.

11

### A.  Eighth Amendment

The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII. The contours of Plaintiff's Eighth Amendment claim against the County Defendants emerged only in his brief in opposition to their Motion to Dismiss.  It rests on their failure to serve him with a copy of the certification for extended treatment and their failure to immediately execute the warrant for emergency examination against him.

Plaintiff's claims under the Eighth Amendment will be dismissed.  The rights of individuals who are civilly committed are protected by the Due Process Clause, not the Eighth Amendment's prohibition on cruel and unusual punishment.  *Romeo v. Youngberg*, 644 F.2d 147, 156 (3d Cir. 1980) (en banc), *vacated on other grounds by* 457 U.S. 307 (1982); *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (holding that the Eighth Amendment's protections apply solely to inmates who have been sentenced).  As amendment of this claim would be futile, dismissal will be with prejudice.  *Grayson*, 293 F.3d at 114.

### B.  Fifth Amendment

The Fifth Amendment provides in relevant part that "[n]o person [. . .] shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  In his brief opposing the County Defendants' Motion to Dismiss, Plaintiff contends that his Fifth Amendment rights were violated because the County Defendants "have a custom or policy of not requiring a Miranda warning, or something similar, when seizing a person for involuntary commitment, [] or before the [emergency] examination."

The Fifth Amendment "not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer

official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973). "In any of these contexts, therefore, a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant." *Id*. at 78. "Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution." *Id*.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that the Self–Incrimination Clause of the Fifth Amendment prohibits a prosecutor from using "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Renda v. King*, 347 F.3d 550, 557 (3d Cir. 2003) (quoting *Miranda*, 384 U.S. at 444). Therefore, "prior to custodial interrogation," an individual must be warned "of his right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be provided to him." *Id.*

Plaintiff has not alleged any facts permitting a reasonable inference that the Fifth Amendment's protection against self-incrimination applies here. First, Plaintiff was never subjected to interrogation while in government custody. His emergency examination was conducted by private physicians while in the custody of a private facility. "Miranda deals with governmental conduct toward persons whom the government has subjected to restraint." *United States v. Jaskiewicz*, 433 F.2d 415, 419 (3d Cir. 1970). Statements made while in custody to persons not connected with the government do not fall under *Miranda*. *United States v.*

*Fioravanti*, 412 F.2d 407, 413 (3d Cir. 1969), *cert. denied*, *Panaccione v. United States*, 396 U.S. 837 (1969); *Alston v. Redman*, 34 F.3d 1237, 1250 (3d Cir. 1994) ("noninvestigatory officials" such as doctors who are "charged with the mere custody or care of a suspect" are not "state agents capable of accepting a suspect's invocation of his Miranda rights.").

Even assuming *Miranda* did apply, Plaintiff's right against self-incrimination was not violated because any statements made during his psychiatric examinations were not in the context of criminal proceedings. *United States v. A.R.*, 38 F.3d 699, 703 (3d Cir. 1994) (holding that the failure to administer *Miranda* warnings to juvenile did not deprive him of his right against self-incrimination because their use at a civil transfer hearing did not incriminate him). The only proceeding mentioned in the Complaint is the extended treatment hearing that took place on June 5, but civil commitment proceedings are not criminal proceedings. *See Addington v. Texas*, 441 U.S. 418, 428-29 (1979). Plaintiff's Fifth Amendment claims will be dismissed with prejudice because amendment would be futile. *Grayson*, 293 F.3d at 114.[6]

### C. Sixth Amendment

Plaintiff also asserts a claim under the Sixth Amendment, which provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right [. . .] to be informed of the nature and cause of the accusation." U.S. Const. amend. VI. "The protections provided by the Sixth Amendment are explicitly confined to 'criminal prosecutions,'" *Austin v. United States*, 509 U.S. 602, 608 (1993) (quoting *United States v. Ward*, 448 U.S. 242, 248 (1980)), and

---

[6] Plaintiff also asserts claims under the Due Process Clause of the Fifth Amendment. That provision, however, operates only with regard to the United States, *i.e.* to federal defendants. *Dusenbery v. United States*, 534 U.S. 161, 167 (2002). As Plaintiff did not sue any federal defendants, his due process claims are properly analyzed under the Fourteenth Amendment.

therefore do not apply to Plaintiff's civil commitment.  *See Addington*, 441 U.S. at 428-29.

Accordingly, Plaintiff's Sixth Amendment claims will be dismissed with prejudice.  *Grayson*,

293 F.3d at 114.[7]

### D.  Municipal Liability under the Fourth and Fourteenth Amendments

The remainder of Plaintiff's claims rest on the Fourth Amendment's provisions on

searches and seizures and the Due Process Clause of the Fourteenth Amendment.  Plaintiff

frames these claims against the County Defendants pursuant to the Supreme Court's decision in

*Monell v. Dep't Social Servs.*, 436 U.S. 658 (1978), which held that a municipal entity may be

found liable under Section 1983 "when execution of a government's policy or custom . . . inflicts

the injury."  *Id.* at 694.  To state a claim under *Monell*, the plaintiff must demonstrate "the

existence of an unlawful policy or custom" and "establish that the government policy or custom

was the proximate cause of the injuries sustained."  *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d

Cir. 1996).

#### i.    *Fourth Amendment*

Plaintiff raises three challenges on Fourth Amendment grounds.[8]  The "fundamental

inquiry" under the Fourth Amendment is "whether the government's conduct is reasonable under

---

[7] On the same facts, Plaintiff also cites to 50 Pa. Stat. § 7302(c), which requires that "[u]pon arrival at the facility, the person shall be informed of the reasons for emergency examination," but a breach of state law provides no basis for a Section 1983 claim.  *Benn*, 371 F.3d at 174.

[8] The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.  It applies to the States through the Due Process Clause of the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 655 (1961), in civil proceedings as well as criminal investigations.  *Doby*, 171 F.3d at 871.

the circumstances." *Doby v. Decrescenzo*, 171 F.3d 858, 871 (3d Cir. 1999).

### a. Duration of Warrants

Plaintiff's first Fourth Amendment claim is that his constitutional rights were violated because "[l]ocal custom allows for a warrant for emergency examination based on information from at most 30 days prior and on petitioner's suspicion of harm within the next 30 days (50 Pa. Stat. § 7301) to last for 30 days before growing stale and expiring, if not acted upon." The Complaint contends that "[a]ny unreasonable lapse in time between the issuance and the use of the warrant places its validity in jeopardy."[9]

The thirty-day warrant validity period of which Plaintiff complains comes from the MHPA itself—as Plaintiff himself concedes by citing to the statute. A Section 302 warrant may issue upon an application "setting forth facts constituting reasonable grounds to believe a person is severely mentally disabled." 50 Pa. C.S.A. § 7302(a)(1). The statutory definition of "severely mentally disabled" rests on a finding that an individual poses "a clear and present danger," *id.* § 7301(a), which "shall be shown" by certain, statutorily-defined conduct occurring "within the past 30 days." *Id.* § 7301(b). A warrant may be valid for up to thirty days, therefore, because the MHPA permits a warrant to be executed on the basis of evidence up to thirty days old.

"[W]hen a county is merely enforcing state law, without adopting any particular policy of its own, it cannot be held liable under the *Monell* line of cases." *Doby*, 171 F.3d at 868. Because a 30-day warrant validity period tracks the MHPA, there is no evidence that the County Defendants maintained a custom that denied Plaintiff his due process rights. *See Benn*, 371 F.3d

---

[9] The Complaint alleges that this "unreasonable lapse" violates the MHPA, and the Fourth and Fifth Amendments. In his opposition brief, Plaintiff contends that it also violates the Eighth and Fourteenth Amendments. Section 1983 does not recognize a cause of action for the violation of state statutes, *Benn*, 371 F.3d at 174, and as this claim must be dismissed with prejudice for failure to allege a policy or custom, the specific constitutional provision allegedly violated is immaterial to the analysis.

at 174 (*Monell* claim based on failure to grant a hearing prior to involuntary commitment failed because the hospital's "guidelines track the MHPA, which does not deny due process").  As amendment would be futile, this Fourth Amendment claim will be dismissed with prejudice. *Grayson*, 293 F.3d at 114.

### b.  Verification of Facts Alleged in Warrant Petitions

Plaintiff's second Fourth Amendment claim challenges the County Defendants' "custom or policy of not verifying any facts" averred in petitions for emergency examination warrants, with the result that the warrants are based on "evidence which does not meet probable cause evidentiary standards in violation of the fourth amendment."

In general, the Fourth Amendment requires that a search or seizure be conducted only pursuant to a warrant supported by probable cause.  *Griffin v. Wisconsin,* 483 U.S. 868, 873 (1987).  However, "the Supreme Court has held that states may act without obtaining a warrant and without probable cause in situations where 'special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable.'"  *Doby*, 171 F.3d at 871 (quoting *Griffin*, 483 U.S. at 873).  The "special needs" exception to the Fourth Amendment's warrant and probable cause requirements applies to "the temporary involuntary commitment of those deemed dangerous to themselves or others" because "[s]uch emergency cases present a situation where seeking a warrant is *systemically* impracticable."  *Id*. (emphasis in original) (citing *McCabe v. Life-Line Ambulance Serv., Inc.*, 77 F.3d 540, 549 (1st Cir. 1996)).

In keeping with this context, "[t]he MHPA clearly permits seizures of mentally ill individuals without requiring county officials to apply to a magistrate for a warrant that would be issued only upon probable cause."  *Id.* at 871 n.5; *see also In re J.M.*, 726 A.2d 1041, 1048 (Pa. 1999) (holding that "[t]he probable cause inquiry required in the criminal warrant context" does

not apply to warrants issued under the MHPA).  "Instead, the statute creates an alternative warrant scheme."  *Doby*, 171 F.3d at 871 n.5.  Under this alternative scheme, county officials are not required to independently verify the facts asserted by the petitioner before issuing a warrant for emergency examination.  *See* 50 Pa. C.S.A. § 7302(a)(1); *In re J.M.*, 726 A.2d at 1049 ("[T]here is no blanket requirement . . . that information be verified by outside sources before a section 7302 warrant can properly be issued.").

Indeed, the Third Circuit held that the MHPA's alternative warrant scheme is constitutionally reasonable under the Fourth Amendment and that, specifically, "[b]ecause the section 7302 procedures exist to respond to emergency cases, it is reasonable for the county delegate to . . . *issue such warrants without independent investigation*."  *Doby*, 171 F.3d at 872 (emphasis added) (noting that "magistrate judges often issue warrants based on information supplied by police officers who themselves are relying on absent informants").  This holding forecloses Plaintiff's argument as a matter of law.  Because amendment would be futile, this claim will be dismissed with prejudice.  *Grayson*, 293 F.3d at 114.

### c.  Identity of Warrant Petitioners

Plaintiff's third claim under the Fourth Amendment challenges the County Defendants' custom or policy of issuing warrants based on petitions by physicians who: (1) "are related to, married to, or reside with those people against whom the petition for warrant is directed"; and/or, (2) "are not treating, nor have ever treated, those people against whom the petition for warrant is directed nor are mental health experts."  This contention fails to identify a *municipal* policy or custom that could have caused the alleged constitutional violation.

To state a claim for municipal liability under *Monell*, the plaintiff must "identify a custom or policy, and specify what exactly that custom or policy was."  *McTernan v. City of*

*York,* 564 F.3d 636, 658 (3d Cir. 2009).  "Policy is made when a 'decisionmaker possess[ing]

final authority to establish municipal policy with respect to the action' issues an official

proclamation, policy, or edict."  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)

(alteration in original) (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1480 (3d Cir. 1990)).

"Custom, on the other hand, can be proven by showing that a given course of conduct, although

not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to

constitute law."  *Id.*

Section 302 of the MHPA permits the issuance of a warrant for emergency examination

"[u]pon written application by a physician or other responsible party."  50 Pa. C.S.A.

§ 7302(a)(1).  Therefore, in permitting physicians who reside with the individual named in the

warrant, or who have not treated that individual, to petition for a warrant, the County Defendants

were enforcing state law—conduct which triggers no liability under Section 1983.  *Doby*, 171

F.3d at 868.[10]  This claim will be dismissed with prejudice.  *Grayson*, 293 F.3d at 114.

### ii.   *Fourteenth Amendment*

Plaintiff's remaining claims against the County Defendants are brought pursuant to the

Due Process Clause of the Fourteenth Amendment which provides that [n]o state shall . . .

---

[10] Plaintiff also contends that the County Defendants have a custom and policy of "issuing warrants which do not
meet the particularity requirements of the Fourth Amendment."  Plaintiff's only factual allegation as to particularity
is that the "warrant is a search of the mind based on unverified information and extremely vague criteria."  The fact
that a warrant is based on unverified information in a petition does not violate the Fourth Amendment, as discussed
*supra*.  The contention that the warrants issued by the County Defendants are based on "extremely vague criteria" is
a conclusory legal assertion, and as such, is not entitled to an assumption of truth.  *Iqbal*, 556 U.S. at 679.

Plaintiff also asserts that the County Defendants violated the Fourth Amendment by: (1) "issuing warrants for
unreasonable searches"; (2) "issuing warrants relying on evidence which does not meet probable cause evidentiary
standards"; and, (3) "using these warrants and petitions in the subsequent procedures despite the differences from
constitutional standards in the evidentiary burden and standards."  As discussed, *supra*, the probable cause
evidentiary standards do not apply to warrants issued under the MHPA, and without factual support, the allegation
that the County Defendants issue warrants for unreasonable searches is a legal conclusion that must be disregarded.
*Iqbal*, 556 U.S. at 679.

deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend.

XIV § 1. This clause embodies two concepts: "procedural due process," a guarantee of fair

process, and "substantive due process," a bar on abuses of executive power. *Cnty. of*

*Sacramento v. Lewis*, 523 U.S. 833, 840, 842 (1998).

"In analyzing a procedural due process claim, the first step is to determine whether the

nature of the interest is one within the contemplation of the 'liberty or property' language of the

Fourteenth Amendment." *Newman v. Beard*, 617 F.3d 775, 782 (3d Cir. 2010) (quoting *Shoats*

*v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000)). If a complaint alleges the deprivation of a

constitutionally-cognizable liberty or property interest, "the question then becomes what process

is due to protect it." *Newman*, 617 F.3d at 783 (quoting *Shoats*, 213 F.3d at 143). To answer this

question, courts "weigh[] the liberty interest of the individual against the legitimate interests of

the State, including the fiscal and administrative burdens additional procedures would entail."

*Youngberg v. Romeo*, 457 U.S. 307, 321 (1982).

Substantive due process "bar[s] certain government actions regardless of the fairness of

the procedures used to implement them." *Cnty. of Sacramento*, 523 U.S. at 840 (quoting *Daniels*

*v. Williams*, 474 U.S. 327, 331 (1986)). The "core" of this concept is "protection against

arbitrary action." *Id*. at 845. However, "only the most egregious official conduct can be said to

be 'arbitrary in the constitutional sense.'" *Id*. at 846 (quoting *Collins v. Harker Heights*, 503

U.S. 115, 129 (1992)). To offend substantive due process, an executive abuse of power must be

one that "shocks the conscience." *Id*. at 846.

### a.  Certification for Extended Treatment

#### 1.  *Procedural Due Process*

Plaintiff alleges that the County Defendants' failure to serve him a copy of the

certification for extended treatment as required by Section 303(e) of the MHPA breached his procedural due process rights.  Specifically, in his response brief, Plaintiff maintains that the copy of the certification was his personal property, and that the County Defendants' custom or policy of "using an inadequate system to ensure the service and verification of service for extended involuntary treatment" unlawfully deprived him of that property.[11]

To the extent this allegation is made to support a claim for a violation of Section 303(e) of the MHPA, it is unavailing because, once again, "Section 1983 does not provide a cause of action for violations of state statutes."  *Benn*, 371 F.3d at 174 (quoting *Brown v. Grabowski*, 922 F.2d 1097, 1113 (3d Cir. 1990)).  And Plaintiff has not shown that the County Defendants had such a custom or policy because he did not allege the existence of any "official proclamation, policy, or edict" to that effect, and the facts do not support a reasonable inference that the County Defendants' conduct was "so well-settled and permanent as virtually to constitute law." *Bielevicz*, 915 F.2d at 850.

With respect to the County Defendants, the Complaint alleges that: (1) Plaintiff never received a copy of the certification; (2) on June 25, 2020, after his release, he contacted the Delaware County Office of Behavioral Health and was put in contact with Dion Gilliard, the Mental Health Court Clerk; (3) when he had not heard back from Gilliard a few days later, he

---

[11] "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972). Property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.* at 577.  Although not addressed by the Parties, whether Plaintiff has a constitutionally-cognizable property interest in a copy of the certification is doubtful because Pennsylvania courts do not appear to recognize entitlement to that benefit.  The Pennsylvania Superior Court held that, absent a showing of prejudice, the failure to timely serve a copy of the certification on a committed individual constitutes a "technical violation" of the MHPA that does not require the vacation of an order of commitment.  *In re S.L.W.*, 698 A.2d 90, 92-93 (Pa. Super. 1997).  The court also held that a hospital's policy of reading the certification to patients and not giving them a personal copy was "reasonable and adequate" under the MHPA.  *Id.* at 94 n.3.

went to the Office of Behavioral Health in person, but was "unable to get in contact with anyone there"; (4) he continued to communicate with Gilliard by email; and, (5) on April 12, 2021, the Office of Behavioral Health told him that the clerk was not in the office due to the pandemic.

These facts do not support an inference of a well-settled and permanent course of conduct. They do suggest that communicating with the Office of Behavioral Health was challenging, but they also show that the pandemic was affecting its operations. And although it took a few days for Gilliard to respond, Plaintiff concedes that he communicated with her via email for some time afterwards and it cannot be inferred from that fact that Gilliard customarily used an inadequate system to serve certifications. Accordingly, this claim will also be dismissed with prejudice.

### 2. *Substantive Due Process*

Responding to the County Defendants' Motion to Dismiss, Plaintiff also asserts a substantive due process against Gilliard for the failure to serve the certification, alleging that her actions "shock the conscience" and that she was "at least deliberately indifferent."

"Whether an incident 'shocks the conscience' is a matter of law for the courts to decide." *Benn*, 371 F.3d at 174. Courts are "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. Harker Heights*, 503 U.S. at 125 (city's duty to provide a safe working environment is not a substantive component of the Due Process Clause). The threshold for liability is accordingly high. *See, e.g.*, *Benn*, 371 F.3d at 174 ("[I]nvoluntary commitment under the MHPA does not in itself violate substantive due process; *Boyanowski v. Cap. Area Intermediate Unit*, 215 F.3d 396, 400-01 (3d Cir. 2000) (defamatory statements were not sufficiently egregious to violate substantive due process); *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 286 (3d Cir. 2004) (absent allegations of corruption, self-dealing, interference with

22

constitutionally protected activity, bias against an ethnic group, or other conscience-shocking behavior, township did not violate substantive due process in zoning dispute).

The Constitution does not impose liability "whenever someone cloaked with state authority causes harm." *Cnty. of Sacramento*, 523 U.S. at 848.  Negligence "is categorically beneath the threshold of constitutional due process." *Id*. at 849.  To state a substantive due process claim, a plaintiff must allege at least deliberate indifference, that is, "conscious disregard of a substantial risk of serious harm." *Kedra v. Schroeter*, 876 F.3d 424, 437 (3d Cir. 2017) (quoting *Vargas v. City of Phila.*, 783 F.3d 962, 973-74 (3d Cir. 2015)) (explaining that deliberate indifference is the lowest of "three potential levels of culpability" applicable to substantive due process claims).

The Complaint does not plead sufficient facts to support a reasonable inference that Gilliard engaged in conscience-shocking conduct.  Plaintiff has alleged nothing more than that she did not immediately respond to his inquiries, and that she later spoke with him by email. Without more, these facts do not suffice to survive a motion to dismiss.  Plaintiff's substantive due process claim against Gilliard will be dismissed with prejudice.

### b. Identity of Warrant Petitioners

Plaintiff's challenge to the identity of MHPA warrant petitioners pursuant to the Fourth Amendment was discussed above; the same claim must now be analyzed under the Fourteenth Amendment.  The Complaint alleges that this policy or custom violates procedural due process because it taints the petition with "inherent bias," and opens the process to the "potential for malicious use."[12]

---

[12] Plaintiff also asserts that relying on the information contained in petitions by such individuals violates equal

Here, Plaintiff has passed the first step of the procedural due process analysis because "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington*, 441 U.S. at 425; *see also Zinermon v. Burch*, 494 U.S. 113, 131 (1990) ("[T]here is a substantial liberty interest in avoiding confinement in a mental hospital."). To determine what procedure is due, it is necessary to weigh the "individual's interest in not being involuntarily confined indefinitely" against "the state's interest in committing the emotionally disturbed under a particular standard of proof." *Addington*, 441 U.S. at 425.

In *Doby*, the plaintiffs argued that letting non-physicians petition for a warrant under Section 302 of the MHPA violated the Due Process Clause because it would "lead to arbitrary deprivations of liberty as the petitioner may have improper motives." *Doby*, 171 F.3d at 869. "[T]he Supreme Court has held that a state, in conformity with the Due Process Clause, may confine mentally ill individuals if it shows by clear and convincing evidence that the individuals are ill and *dangerous* to themselves or others." *Id.* at 870 (emphasis in original) (citing *Foucha v. Louisiana,* 504 U.S. 71, 80 (1992)). The *Doby* plaintiffs, therefore, were arguing that "permitting non-physicians to apply for such warrants 'converts a constitutional process into an unconstitutional one.'" *Id*. at 870.

This argument did "not withstand scrutiny" for several reasons. *Id.* First, the Third Circuit noted that the plaintiffs had offered no evidence in support of their contention that non-physicians were "inherently unreliable fact informants." *Id.* Second, the role played by petitioners under the MHPA is limited—"making clinical determinations about an individual's

---

protection, because it has an "adverse effect upon a group, in this case the individuals for whom a petition is written." As this claim was not raised in the Complaint, it is not before the Court.

mental state" is a task entrusted to the county delegate, "who has the duty to decide whether the information provided by the petitioner constitutes grounds for issuing a warrant." *Id*. Third, the court found it "likely that a person other than a physician or a mental health professional will have the material information." *Id*. Fourth, Section 302 permits the county delegate to review petitions by a "physician or other responsible party," and the plaintiffs in *Doby* had not "proffered any evidence to suggest that [the defendants] have a practice of issuing warrants when a petitioner seems clearly imbalanced or otherwise impaired." *Id*. Finally, the *Doby* Court observed that providing false information on an application constitutes a misdemeanor in Pennsylvania, a "built-in safeguard to prevent ill-motivated individuals from seeking involuntary examination of others." *Id*.

*Doby's* reasoning is controlling here, and Plaintiff's argument that allowing physicians with certain ties to an individual or physicians who are not specialized in psychiatric care to petition for an emergency examination warrant renders the MHPA's warrant procedures unconstitutional must be rejected. First, like the *Doby* plaintiffs, no facts have been alleged here in support of Plaintiff's contention that certain physicians are inherently biased informants. Second, these physician petitioners would not rob the County Administrator of her discretion. Third, physicians who are related to or reside with the individual identified in the warrant are likely to have material information concerning his or her mental state. Fourth, the MHPA permits "a physician or other responsible party" to apply for a warrant for an emergency examination, 50 Pa. C.S.A. § 7302(a)(1), with no exception based on the physician's specialty or relationship to the individual to be examined, and Plaintiff has not alleged that the County Defendants have a "practice of issuing warrants when a petitioner seems clearly imbalanced or otherwise impaired." Finally, the petitioner's oath and the threat of liability for a criminal

misdemeanor provide additional safeguards against any foul play in individual cases.  As amendment would be futile, this claim will be dismissed with prejudice.[13]

c. <u>Verification of Facts Alleged in Warrant Petitions</u>

Plaintiff renews his challenge to the County Defendants' policy or custom not to verify the facts averred in warrant petitions under the Fourteenth Amendment.  Specifically, in his response brief, Plaintiff alleges that the County Defendants "overrel[y] on post-deprivation remedies" even though the pre-deprivation remedy of verifying facts would be "practicable" and would not cause "inordinate" delay.

Plaintiff's allegation is not persuasive.  To the contrary, the delay inherent in verifying the facts asserted in a petition "would entail delays with potentially life-threatening consequences." *Doby*, 171 F.3d at 871.  It would "frustrate the very purpose of the emergency evaluation and treatment sections of the MHPA, which is to render immediate assistance to those persons who are in need." *In re J.M.*, 726 A.2d at 1048.  Given that a warrant for emergency examination authorizes the curtailment of an individual's liberty for at most several hours, *Doby*, 171 F.3d at 872, and in light of the other safeguards in place, including the oath of the petitioner, the requirement that a petitioner be a "responsible party," and the County Administrator's duty to make a reasonableness determination, requiring independent verification of a petitioner's facts

---

[13] Although no substantive due process claim related to these factual allegations is evident from the face of the Complaint, the County Defendants interpret it as containing one and Plaintiff, in responding to the County Defendants' Motion to Dismiss, briefly asserts that the County Administrator's reliance on petitions completed by such physicians is "at least deliberately indifferent to the rights of others in a conscience shocking way."  The Third Circuit rejected this argument, holding that its "conclusion [] that the MHPA authorizes seizures that are 'reasonable' under the Fourth Amendment establishes that the MHPA meets the rationality test imposed by substantive due process analysis." *Doby*, 171 F.3d at 871 n.4.  As the County Defendants' conduct has been found reasonable under the Fourth Amendment in this case as well, any substantive due process claim based on the same facts must be rejected.

would be "unduly burdensome in proportion to the liberty interest at stake." *Zinerman*, 494 U.S. at 132.[14]  As amendment would be futile, this claim will be dismissed with prejudice. *Grayson*, 293 F.3d at 114.

### d.  Approval of Treatment Facilities

#### *1.  Claim Against the County Entities*

The Complaint alleges that the County Defendants should be held liable for their "touchstone policy of approval of facilities to provide involuntary, inadequate treatment."[15]  To establish municipal liability under Section 1983, a plaintiff "must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom [or policy] and the specific deprivation of constitutional rights at issue." *Kneipp*, 95 F.3d at 1213 (quoting *Bielevicz*, 915 F.2d at 850).

It appears from the Complaint that the specific deprivations at issue in relation to this claim are those deprivations allegedly committed by the Crozer-Chester Defendants after Plaintiff arrived at Crozer-Chester for an emergency examination.  As explained above, the MHPA leaves the decision of whether to examine and treat an individual involuntarily in the hands of the treatment facility.  Thus, Plaintiff cannot allege a "plausible nexus" between any County policy and the Crozer-Chester Defendants' examination and treatment of patients. Accordingly, this claim will be dismissed with prejudice, on futility grounds. *Grayson*, 293 F.3d at 114.

#### *2.  Claim Against the County Administrator*

---

[14] In his brief in opposition, Plaintiff also alleged that by issuing warrants in reliance on unverified information, the County Administrator is "at least deliberately indifferent to the rights of others in a conscience shocking way."  As explained *supra* note 13, this argument is foreclosed by *Doby*, 171 F.3d at 871 n.4.

[15] The approval of treatment facilities is a duty delegated to the County Administrator and the Pennsylvania Department of Human Services.  50 Pa. C.S.A. § 7105.

Plaintiff also asserts claims against Tracy Halliday in her official capacity as the County Administrator.  One of her duties under the MHPA as County Administrator is the approval of treatment facilities.  50 Pa. C.S.A. § 7105.  Plaintiff alleges that, because conditions at Crozer-Chester failed to meet constitutional standards, Halliday demonstrated reckless disregard in approving Crozer-Chester as a treatment facility and was "deliberately indifferent to the failures of the facility and [is] creating a danger for individuals whom [she] send[s] there."  These arguments appear to invoke the state-created danger doctrine to argue that Halliday should be held liable for the constitutional violations that allegedly occurred at Crozer-Chester.

"[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."  *DeShaney v. Winnebago Cnty. Dep't of Social Servs.*, 489 U.S. 189, 195 (1989).  However, "there is an exception to this general rule that nevertheless holds an officer liable if his conduct exposes an individual to a 'state-created danger.'"  *Kedra*, 876 F.3d at 436 (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008)).  A state-created danger exists if (1) "the harm ultimately caused was foreseeable and fairly direct"; (2) "a state actor acted with a degree of culpability that shocks the conscience"; (3) "a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general"; and, (4) "a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all."  *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006) (internal quotations omitted).

Like this claim against the County Defendants, Plaintiff's claim against Halliday fails

under the first element because he cannot show causation.  "State actors are not liable every time their actions set into motion a chain of events that result in harm." *Henry v. City of Erie*, 728 F.3d 275, 283 (3d Cir. 2013).  A plaintiff must show that the defendant's actions were a "fairly direct" cause of the harm.  *Id*. at 283.  To fulfil this requirement, "the plaintiff must plausibly allege that state officials' actions 'precipitated or w[ere] the catalyst for' the harm for which the plaintiff brings suit." *Id*. at 285 (alteration in original).  In other words, the defendant's actions must have caused the harm "to happen or come to a crisis suddenly, unexpectedly, or too soon." *Id*.  "[I]t is insufficient to plead that state officials' actions took place somewhere along the causal chain that ultimately led to the plaintiff's harm." *Id*.

"[I]mproper licensure will often be too far removed from the ultimate harm to permit liability under § 1983." *Id*. at 284-85 (holding that officials' approval of apartment for subsidy program despite known fire safety deficiencies did not lead "fairly directly" to the fire that killed plaintiffs).  Such has proved true here.  The mere fact that the County Administrator is charged with approving facilities for the purpose of involuntary treatment does not make her responsible for the conduct of approved facilities, which have discretion in deciding whether to examine or treat patients.  Plaintiff therefore has not stated a substantive due process claim in connection with the approval of facilities and his claim against Halliday will be dismissed with prejudice because amendment would be futile.  *Grayson*, 293 F.3d at 114.

## V.   INJUNCTIVE RELIEF

Plaintiff's claims for injunctive relief will be dismissed with prejudice for lack of standing.  "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy the threshhold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).  To satisfy this

requirement, Plaintiff must allege that he "has sustained or is immediately in danger of sustaining some direct injury" that is "'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* at 101-02. The Complaint seeks redress for past injuries related to Plaintiff's involuntary committal in June 2020. It alleges no facts suggesting that Plaintiff will be involuntarily examined or committed again—any future injury is purely conjectural. Because there is no "real and immediate threat," Plaintiff has no standing to seek injunctive relief.[16]

## VI.    STATE LAW CLAIMS

Courts exercise supplemental jurisdiction over related state law claims under 28 U.S.C. § 1367. *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009). "The decision to retain or decline jurisdiction over state-law claims is discretionary," and "should be based on considerations of 'judicial economy, convenience and fairness to the litigants.'" *Id.* (quoting *New Rock Asset Partners, L.P. v. Preferred Entity Advancements, Inc.*, 101 F.3d 1492, 1505 (3d Cir. 1996)). Under Section 1367, a court may decline to exercise supplemental jurisdiction once it has "dismissed all claims over which it has original jurisdiction." *Id.* (quoting 28 U.S.C. § 1367(c)(3)).

All of Plaintiff's claims against the Commonwealth Defendants have been dismissed, *Guilday v. Crisis Ctr. at Crozer-Chester Med. Ctr.*, 2022 WL 507484 (E.D. Pa. Feb. 17, 2022), and his federal claims against the Crozer-Chester Defendants and the County Defendants will be dismissed for the reasons set forth herein. Therefore, no federal claims have survived the Defendants' motions to dismiss. This case is yet at its inception; no principle of judicial

---

[16] In his response to the County Defendants' Motion to Dismiss, Plaintiff asserts that, in addition to challenging the customs and policies of the County Defendants, he is also challenging the constitutionality of the MHPA. As this claim was not raised in the Complaint, it is not before the Court.

economy would counsel the continued exercise of supplemental jurisdiction over Plaintiff's state law claims and the Parties have identified no concerns that would render the state courts an inconvenient or unfair forum.  Accordingly, Plaintiff's state law claims will be dismissed without prejudice so that Plaintiff may refile them in the proper state forum, should he so choose.

## VII.    CONCLUSION

"The confinement of an individual to an institution for [] the mentally ill . . . entails a 'massive curtailment of liberty.'"  *Romeo*, 644 F.2d at 157 (quoting *Humphrey v. Cady*, 405 U.S. 504, 509 (1972)), *reversed on other grounds by* 457 U.S. 307 (1982).  It is evident that Plaintiff suffered in body and mind when he was involuntarily committed and that he continues to endure symptoms of distress to this day.  But as pled, his Complaint does not support a cause of action in federal court.

For the reasons stated herein, Plaintiff's federal claims against the Crozer-Chester and against the County Defendants will be dismissed with prejudice.  Plaintiff's state law claims will be dismissed without prejudice.

An appropriate order follows.

**BY THE COURT:**

**/s/Wendy Beetlestone, J.**

_____

**WENDY BEETLESTONE, J.**

31